Good morning. We are prepared to hear State of Saylor v. Rochford. Mr. Clark, are you ready? Yes. Good morning. Please report. We submit that the District Court's first error was applying a reasonableness analysis to the issue of the arrest. The court, following the appellee's leads in their argument, understandably perhaps took the position that this tragedy might have been avoided had the officers done nothing. However, the erroneous analysis of the arrest issue skewed the rest of the court's analysis. The plaintiff did not allege that there was no probable cause for the arrest, and the District Court neither found nor intimated that there was probable cause. The facts were undisputed that Mr. Saylor had committed a variety of misdemeanors, at least including trespass. Let me ask you something. It seems to me that this may be going in a direction which is not totally helpful to the analysis. I understand from the facts that he was not arrested for the purpose of bringing him to trial on a crime. He was basically being excluded from property, removed from property because he had exceeded the license or the permission to be there. They were trying to get him off either by talking or by force, and so they were using force to get him off the property, but I never saw anybody's interest in having him prosecuted for a crime. Basically, they were trying to remove him from the theater. Well, I think that's a fair reading of the record. So the ultimate question is, in those circumstances, what was objectively reasonable force? The officer, Rochford, in particular, who initiated this, was asked what his intentions were once he placed his hands on Mr. Saylor. Which, of course, is irrelevant to the objectives here. It is irrelevant, but equally irrelevant, I would submit, is the absence of any testimony that there was a specific prosecutorial purpose for doing what he did. There was a Fourth Amendment seizure at the point Officer Rochford, acting as a deputy sheriff, placed his hands on Mr. Saylor, and that was an arrest by any definition. Because it was an arrest, it follows inexorably that the officers were allowed to use reasonable force. I submit this is not an improper segmenting of what occurred. There's no contention that there was no probable cause. The closest the plaintiff comes to this is observing at page 10 of their brief that Rhodes, the theater manager, gave somewhat conflicting testimony as to what he told Rochford. Was it necessary to lay hands on this individual? He had readily observable Down syndrome. I mean, they could tell that. I mean, this is a person with an IQ of 40, which is, you know, in the severely and profoundly retarded range. You would deal with somebody with Down syndrome differently than you would deal with somebody who plainly had their faculties about them. The deputies recognized Mr. Saylor as having Down syndrome, but they knew nothing about his IQ. They knew nothing about his additional mental illness diagnoses. If somebody had Down syndrome, wouldn't that suggest a certain degree of caution? It would, and I think the deputies testified that they exercised it. Rochford, the one who initiated the approach, had training, as described in the briefs, as a hostage negotiator and whatnot. He had in mind, at least in general terms, the sheriff's office general order on dealing with those with mental disabilities or illnesses. He obviously didn't pull it out and read it, but he had it in mind, and he testified that, I heard the caretaker tell me that he might get violent. I could see he's a large individual with distinctive Down syndrome features, so I approached him carefully. Excuse me, Judge. But didn't the record reflect that the officers were clearly told that because of his mental issues that he would react adversely if he was touched? I don't think it went quite that far. I think that was certainly the testimony of the caretaker, and understanding this is summary judgment, we construe the facts favorably to the plaintiff. So given that, let's assume that's what happened. But the officer is not obliged to take advice, or let me say instruction, from a bystander, even if she's a caretaker. She's a young woman. She had who knows what expertise. The officer certainly had none, and it was not irrational for her to tell him to be careful, but he was. But under Rowland v. Perry, isn't the officer, in assessing the reasonableness of the force to be used, required to take into consideration any mental deficiency or disability that the individual may have? In a general way, yes, but not in a specific way as applied to this case. There is no ADA clause as such on the Fourth Amendment. The individual's characteristics, insofar as they are known to the officer, are certainly relevant, a relevant part of the circumstances. But if a crime has occurred, the officer, under a Fourth Amendment analysis, is entitled to arrest. If he's entitled to arrest, he's entitled to- a movie ticket and for all those things. They did have probable cause on that. The only thing that concerns me and bothers me in the particular circumstances of the case, the person's profound severe mental retardation, which was evident. And then, as I understand it, he was not trying to flee, or he was just sitting there. He wasn't trying to resist. It didn't seem to me that he was a- if there was some evidence that he was a threat to the officers in some way, or if there was evidence that he was a threat to any other patron of the theater, then I think the officers would be totally justified. But this is a closer case. It's a closer case because he wasn't harmful to anyone or threatening anybody. That's the thing that is concerning me. You have a profoundly retarded person who's not threatening anybody. And I don't- just the particular circumstances here don't suggest a certain degree of caution and restraint. I don't disagree that a certain degree of caution and restraint were required. But you're not contending he was a threat to anybody. Well, the officers all testified that they did, at least in general terms, perceive him as a threat. Did they think he had a weapon on him? No. Yeah, but Sheriff, it seems to me the focus is- you don't want to fragment the facts, but they did talk to him for two or three minutes trying to persuade him to come out. Right. He had been escorted out and then went back in. Right. And then they were escorting him out by force. Right. And they didn't put him under arrest. They escorted him out by force, pushing him out. And he was going along. He was resisting during that period. But the arrest- announcement of arrest and the handcuffing didn't occur until everybody stumbled in that pile. Well- And then at that point, the officers were not sure what's happening. And they wanted to bring more to the situation. But up until that point, they were doing exactly what they could do. They talked to him. It didn't work. They had patrons in the theater. They want to start the film. He has to be escorted out. They lifted him up and escorted him out. And at that point, there's no constitutional violation. You can escort somebody out. Sure. And then they stumbled in this pile unexplainably, right? Unexplainably. Yeah. So at that point, the officers react and say we need to cuff him to bring order to the circumstance because they're all now falling for each other  It's unfortunate. It's a tragedy. But I don't think the analysis of being threats to officers and prior records and probable cause is the issue. The question is, was the force reasonable in the circumstances? And the question is, what are the officers supposed to do at that point? The Graham factors are not particularly helpful here. They obviously exist. They're not exclusive. They're not. It's not the same concept. It's not. And this case is markedly different. That's why I wanted to get you on the analysis that this is not where somebody's fleeing or threatening officers. This is a context where the officers are allowed to use force to escort somebody out of the theater. And they did not arrest him. They escorted him out. And when they tripped and fell and everybody's falling on each other, they don't know whether he's causing that because he is resisting at that point. Then they want to cuff him in order to be able to bring order to that. Confusion at that point. It seems to me it's hardly a constitutional case where there are personal assets that run the line. I would say this is a poor vehicle for a Fourth Amendment claim against the deputies. The ADA aspect of this will be tried. Why didn't you say that the Graham factors are not relevant here? Because they ask us to assess the severity of the crime and the threat to the officers. I misspoke if I said they're not relevant. Certainly they're relevant. They're not exclusive is all I was trying to say. There are other circumstances at issue. And that points out the difference between this case and Rowland. Rowland, again, a minor matter that escalated by aggressive action. That opinion clearly says that the force used in Rowland was both prolonged and substantial. And that's not the case here. There is no case, I would submit, within controlling precedent that could possibly have alerted these officers that the minimal, and I stress minimal, use of force they actually employed could have violated Mr. Saylor's Fourth Amendment rights. Weren't the officers also given another option short of even using any force at all? In terms of the record indicating that they were given the option of simply waiting for his mother to appear, let him pay for a second ticket, stay where he was. Was that in the record? Well, sure. But that analysis is part of, well, it's an improper analysis. Yes, it is. And it's improper because it's not whether they had alternatives. There are always alternatives, almost. The question is whether what they did was reasonable under the circumstances. And if it wasn't, I again submit there is no case in the Fourth Circuit or the Supreme Court that could have told these officers that they were violating his Fourth Amendment rights. And that's the heart, of course, of this appeal. Rowland doesn't tell them that. But were they not required to de-escalate when you're dealing with someone with a mental disability? In other words, isn't that already established? No. There is no requirement in Fourth Amendment analysis that they de-escalate. It's certainly a factor to consider, Your Honor. I don't dispute that. But it's like the continuum of force. You can argue that the officers should start at the lowest level of force. I'm not sure that it helps to talk about disabled individuals as a general category. Because there can be disabled individuals who can be genuine threats to passersby, to others, to the officers. And the officers are certainly entitled to do whatever is necessary to remove that threat. The thing that troubles me is this fellow with observable down syndrome was just sitting in the theater. And he wasn't threatening anybody. I just wonder whether in some situations you just kind of wait that thing out until people calm down a little bit, and someone else arrives, and whatever. I'm not sure of all the facts here, particularly with respect to his mother. But the facts here, it seems to me this is one of the most sympathetic cases imaginable. That's the problem. You know, this fellow is overweight, and he has, I guess, a breathing condition. But what happened here is just really tragic. And I don't know whether you can – that's a different thing from saying you can blame the tragedy on the officers. I understand that. We can't just jump from a tragedy to blaming police officers. But you just wonder when you have somebody – I visited a lot of mental retardation facilities when I was at the Justice Department. And so many of the times someone was agitated, and I don't even think this person was agitated. The whole response was to just try to calm things down and to wait an individual out and speak so devotedly. If that is to be the law, Your Honor, in a Fourth Amendment context, I submit it will be the law from this point forward. It has not been the law, I respectfully submit, and the deputies could not possibly have known beyond debate in the language of the Supreme Court that what they were doing was a Fourth Amendment violation. I understand that. I thank you for your argument, and you've got some rebuttal you've reserved time for. Thank you, Your Honor. And Ms. Zachary, I wouldn't get it right, but whatever, I'm glad to have you here. Thank you, Your Honor. It's Zaharia Shevitz, but I don't expect the court to know that before I say it. May it please the court, my name is Jean Zaharia Shevitz, and I'm here on behalf of the Sailors. Robert E. Finn Sailor died on January 12, 2013, because the defendant deputies removed him from a movie theater simply because he didn't pay for an $11 ticket. The district court correctly denied— Let me ask you at that point, is the theater entitled to have him removed by force if he refuses to go? Your Honor, first, that was never a question asked during this case. I'm asking the question, does the theater have the right to remove a patron who doesn't pay for his ticket and refuses to leave? The theater has the right to ask law enforcement. To remove him by force? Yes, Your Honor. It was a question of fact. While we didn't raise, as one of our claims, probable cause— I'm just asking you a straightforward question. Did the theater have a right to remove a patron who remains in the theater and doesn't pay for a ticket? Have a right to remove him by force if he refuses to go? The theater has the right to tell law enforcement that the trespass is being committed. I don't think the theater itself could do so. No, Your Honor. They told law enforcement— Well, I would think the theater could do so, but they did ask law enforcement, which is a safer process. So they asked the law enforcement to remove him. Can the law enforcement remove somebody from somebody's property who refuses to leave by force? Under the law, when they have probable cause, there is a right to arrest, but they use them— No, no. You're missing my question. Just stick with the question. As a general proposition, when somebody calls and complains that somebody's on my property without my permission, and they call law enforcement, can the police officers remove that person from the land by reasonable force? The use of force must always be reasonable, as you say. Yeah. So there is a right to use force if it meets the Granby-Conner factors and isn't excessive. And in this case— Well, that isn't what Granby-Conner said. You take the circumstances of the case. The facts in Granby's-Conner were totally different. The test it came back to and the Supreme Court has come back to again and again is whether the reasonableness of the force exercised in the circumstances, objective reason. Yes, Your Honor. And my question to you is a simple one. If somebody refuses to leave property when asked to do so, can the property owner have officers remove that person by reasonable force? The officer's use of force is only reasonable if it meets the totality of the circumstances of the test. I don't ask whether it's reasonable. I'm assuming it's reasonable. My question is can they have the person removed by reasonable force? The officers have the right to use the force that is reasonable under the circumstances to effect an arrest. Okay. So now the question is they had officers in this case had a right to remove the young man who had kept coming back in. The patrons are waiting for the next film. The theater wants him removed. The officers pick him up and escort him out, pushing him out. They have a right to do that. And the district court found that there was no violation at that point. What happened after that is confusion. They fell on top of each other. He was resisting, and the officers cuffed him. Now, you say the officers acted unreasonably so that they have to pay for all the consequences of that action? What law did they violate? Well, Your Honor, I'd like to clarify. I believe the district court didn't find that there was no unreasonable force until the scuffle. The court found that the officers' actions throughout were unreasonable, and it has been our position throughout as well that the use of force under these circumstances was unreasonable from the start. So you're reversing the proposition I just asked you in the hypothetical, which is the theater then is left to leaving him sitting there without a ticket simply because he refuses to go. In these circumstances, Your Honor, I believe that would have been a more reasonable approach and reaction. I thought you told me that the theater had a right to remove him by reasonable force. The theater has the right to ask officers to do so, but their use of force must still be... And that the officers in that circumstance have a right to use reasonable force to remove him. Yes, but in this case, the use of force was unreasonable under the totality of the circumstances. Okay, that's a sensitive question, but you were retracting. You told me that they had to leave him sitting there. My suggestion is if the officers had a right to remove him by reasonable force, then the only question is where did they go unreasonable when they were using force to remove him? It was in doing so almost immediately when they knew, based on what Ms. Crosby, Mr. Saylor's staff person, had told them that their actions would result in Mr. Saylor becoming angry. And they knew, as Judge Wilkinson said, that this was an individual... He did become angry, and that didn't cause a problem. They escorted him out, and they were successfully escorting him out until this incident where they all tripped. Your Honor, I... Now, if he had been escorted all the way out, you wouldn't have a Fourth Amendment violation, would you? Yes, we would, Your Honor. First, I would like to clarify, escort is a word that deputies use. They pushed him out. They dropped him while he screamed in pain and yelled for his mother, which... No, Your Honor, as they dragged him from the theater, he was yelling, ouch, ouch, it hurts, where's my mom, mommy, which is further evidence of this individual's disabilities and inability to understand what's happening, including when Officer Rochford talked to him for a very minimal... Let me ask you, what force, describe the force that the officers should have used. You said the force they used was unreasonable. Describe for me how the officers removed it by force. No, okay, that... Well, that's a different issue in this case. You're saying no force was allowed. That's not the law. And if you say no force was allowed, that any force would have been unreasonable, you're just eliminating the question, the constitutional question of excesses. He clearly didn't understand what was going on. His response at one point was, I'm with the CIA. The deputies knew he didn't have the mens rea to be committing trespass, to know that he was committing a crime, and so... He's not committing necessarily a crime. You acknowledge they could remove him by force. But that's because he was committing a misdemeanor. He exceeded his license. He wasn't paying for the ticket. The theater can have him removed. The officers can use reasonable force to remove him, and the only question is, did they use reasonable force in this case? Now, you're coming back and changing the argument. You're saying they could not have used any force to remove him. They could not have used any force at the time they did and in the manner they did. The deputies gave no time to assess this situation, to take into account Mr. Saylor's disability. The law is clear that disability is a factor in assessing objective reasonableness like any other physical characteristic. That's what this court said in Bates back in 2004. And the deputies' only example of taking into account Mr. Saylor's disability is talking to him for two minutes before arresting him. Well, that's not quite fair, because they talked to him first. He went out with the manager. They explained to him. After the manager turns attention away, he walks back into the theater and sits down. Then somebody else comes in and talks to him for two or three minutes. In other words, he knew what was going on. He just wanted to see that movie. Your Honor, I think it's disputed whether he knew what was going on, and that fact must be construed in favor of the plaintiffs. Is that important? What if he's unconscious? He can be removed by force. I mean, the point is you're charging these officers with doing something wrong, and they were sensitive to his condition. They talked to him and tried to persuade him, but they recognized under the law they could remove him by reasonable force, and that's what you acknowledged at the outset. Now you're saying an officer is not allowed to use reasonable force to exclude him. Your Honor, I'm saying that the force used here was unreasonable in light of the totality of the circumstances, and that was clearly established for these officers in this Court's opinion in Roland v. Perry, which put them on notice that it is unreasonable. Well, Roland, in conjunction with other cases from this circuit, it is unreasonable to ignore a suspect's known disability and to take an unreasonably aggressive tact that quickly escalates a situation into a violent exchange when there's obviously no need for force. Any violence that occurred here was as a result of the officer's own action. Mr. Saylor never did anything to escalate the situation on his own, and as Judge Wilkinson noted at the start, he was sitting quietly. There was nothing barring the theater patrons from continuing to get ready to enjoy a movie, and that's what was happening here is the lights were on and a movie had not yet started, and Mr. Saylor was sitting quietly. Nobody else knew that he didn't have a ticket. He wasn't bothering anyone. In fact, nobody was bothered until the officers came in and began talking to Mr. Saylor and agitating him and causing the circumstance, and as Roland shows us, we can't segment this into was it okay to use force then, was what they did the next moment okay? You have to look at it under the totality, and here under the totality, the officers knew going in that Mr. Saylor had a disability. They didn't even need to be told that. It was visible, but Ms. Crosby told them, and she told them how he was likely to react if they talked to him and then if they tried to remove him. So you're saying one of the things you're saying is that the circumstances here at least ought to go before a jury. Yes, Your Honor. Maybe you won't prevail before a jury, but the circumstances are such that you think it ought to go before a jury and have a jury take a look at it, and there are a number of disputed facts here, and there are a number of undisputed facts, but there are some disputed facts about his mother and what the officers knew about his mother and the rest, and, you know, on an interlocutory appeal, we're supposed to credit a district judge on that. But I just realize the circumstances of this case is pretty unique because I can't see a threat to anyone or anything. I can't see a threat to property. I can't see a threat to patrons. I can't see a threat to officers. I can't see a threat to anybody or to anything. He wasn't damaging the theater property, was he? No, Your Honor. In fact, the only threat here was to Mr. Saylor once the officers started dragging him from the theater. And you're saying that a jury should take a look at it. Yes, Your Honor. As we said in our briefs, the issue of objective reasonableness is a very fact-intensive question, and it is often one for the jury. Not necessarily. If you were a threat, that would be established. That would be, in my judgment, something to grant judgment as a matter of law or qualified immunity as a matter of law. But those aren't the facts for you. I agree, Your Honor. Here, you focused on threat, which is one of the Granby-Conner factors. We also have the severity of the crime, which is admittedly minor here. It was trespass and theft of services and maybe disturbing the peace, but that only occurred once the deputies, frankly, disturbed the peace. So we have a very minor crime. We have no threat to anyone at all. And Mr. Saylor wasn't trying to flee. There was no attempt to flee arrest, and the deputies knew that any reaction to being touched was likely a result of his disability based on what Ms. Crosby told them. It wasn't a resistance. And so under the Granby-Conner factors, there is no need for force in this circumstance. And then if we consider the other factors that we look at for the totality, such as exigency, there was no exigency here at all. It was a movie that was about to start, and the officers and the theater knew that Mr. Saylor's mother was on her way and would pay for his second ticket. Ms. Crosby told them, I would pay for it, but I don't have the money with me. It was unfortunately the one day she forgot her debit card. And so she couldn't, but she would have been willing to. This wasn't somebody trying to steal a second movie, and everybody knew that. What about the mother's whereabouts? What did the officers know about the mother's whereabouts? Ms. Crosby told them that the mother was on her way, and she lived approximately 20 minutes from the theater. So they knew that she would be there shortly. And frankly, if arrest became necessary because for some reason Ms. Saylor didn't show up, they could have arrested him at the end of the movie. He would still be there because he didn't want to leave. There was no need to forcibly remove him in the manner that they did. And the deputies cite other language from Graham about split-second decisions that officers often must make, but Graham was clear that officers often must make those decisions. But it's not always, and this was not one of those cases. This was not a case where officers are faced with a threatening individual and have to decide on the spur of the moment what's in his hand. Is that a threat to me? Are other people going to be hurt and have to maintain public safety? That just wasn't the case here. This was a man with a visible and profound disability trying to watch a movie for a second time who didn't understand what was going on and who was dragged from a theater because of that. And a jury could find that that was not reasonable, that based on what the deputies knew from what Ms. Crosby had told them from their training, I mean, if Mr. Rochford was trained in de-escalation, he certainly doesn't appear to have used it in this instance. Can I ask you a question in a different posture? Yes, Your Honor. If the officers were entitled to use force to remove somebody from the theater, did the force that they actually used, was it excessive? In these circumstances, yes, Your Honor. And what was excessive? It was excessive that the officers forcibly lifted Mr. Saylor and dragged him. You are not accepting my hypothetical. My hypothetical is if they're entitled to use force to remove him. You said they're not entitled to use force in these circumstances. If they're entitled to use force, and it was clear that they could have used force to remove this gentleman, was the force that they used excessive, and in what respect? Your Honor, and I am not trying to be cagey, I'm not sure how to answer your question without referring to the specific circumstances of this case, because that is how we evaluate any use of force. I know, but I'm saying you may be wrong as a matter of law. My question is, in the force that they exercised, did they do anything excessive? Your Honor, my answer would be that when they first touched Mr. Saylor, which is considered a use of force, physical touching, which we have argued all along was unreasonable in itself. But when they did that, and he then reacted as expected, he flailed his arm. How do you use force without touching? In other words, you're going back and saying you're not entitled to use force. You keep answering my question that he's not entitled to use force. My assumption, my hypothetical is, if the officers are entitled to use force to remove him, did they use excessive force? Your Honor, I think... The answer is no. With all due respect, Your Honor, obviously from all of our briefs we disagree, but I understand. Well, explain to me then. I've asked you what aspect of force that they used. If they're entitled to use it, what aspect was excessive? By escalating the force after they first touched him. So trying to touch him and, in the deputy's words, escort him, which could have been, come with me... You're rejecting the fact that they could even touch him. In other words, that's not an excessive question. That's a question of whether they're entitled to use force at all. If you're going to use force, you have to touch. And my question is, when they are using force to remove him, was there any act? Did they kick him? Did they hit him in the head? Well, Your Honor, there is... Did they use a baton on him? My question is, what aspect of force did they use was excessive if they're entitled to use force? Your Honor, there is circumstantial evidence in terms of the fact that Mr. Saylor's voice box was broken, he did die through positional asphyxia, and there was bruising around his neck, there was blood in his lungs. So I think there's sufficient evidence for a jury to find that even though we don't have the videotape of the entire sequence of events and who touched whom at exactly what moment, a jury could find that there was excessive force here. I understand, but no one has testified that they did any action other than the effort to remove him physically. And when he tripped, they did nothing more than trying to get a cuff on him. They didn't beat him. They didn't hit him. They put a knee in the back and pulled his arms around and took three handcuffs because he was pretty big to get the cuffs on. But the question is, during any of those actions, was it excessive? And our case is that, yes, it was excessive from the moment the force began, under these circumstances. I thought your view was that they lifted him up out of his chair. It wasn't just touching. Sometimes a gentle touch on the arm or something can convey a sense of rapport that lifting somebody out of a chair and then dragging them, that's different altogether. And so they certainly had the right to remove him or to get him out of the theater or to have somebody pay the ticket. There's no question about that. It's a question of how it was accomplished. Yes, sir. And you can do it in all kinds of ways. You can touch somebody and pat them on the arm and say, I'm sorry, you need to go, or whatever. But as I understand your view of the facts, that wasn't what happened. A very heavy man was lifted up, was dragged forcibly, and as a result of that became highly agitated, which he was not before. Yes, Your Honor. And, you know, the initial touch, in some circumstances, an officer touching someone and saying, you have to go now, could be sufficient. It wasn't here. And escalating it when they knew that he would react badly and that because of his disability, things would not go as they wanted. I would say that's not exercising force to remove somebody, that touching. Exercising force to remove somebody means that the force constitutes removal. And the only way, the most simple way to remove somebody by force is to lift them up and carry them out. And that's really what they tried to do. They lifted him up and escorted him out, pushing him out until they stumbled. And it seems to me these officers are acting under the authority of the right to remove somebody by force. And unless you can identify some act during that process that was excessive, this is not a Rodney King thing where they were trying to punish him or kick him or beat him. They were trying to get him out, and they used whatever force they thought was reasonable. And you're saying their judgment was an unconstitutional judgment under some law that I don't understand. Your Honor, my time has run out. May I respond? Yes. I would like to note that the deputy's intention in using force is irrelevant here. It's an objective reasonableness. And under all of the circumstances, they did not act in an objectively reasonable manner. And so we ask for all of these reasons that the court affirm the district court's decision. Thank you very much. Thank you. Mr. Karp, we'd be pleased to hear from you in rebuttal. Thank you, Your Honor. I will necessarily be very brief. The tragedy here is palpable, of course, but sometimes bad facts make bad law. And the law will be as the court announces it. But if it accepts the plaintiff's theory here, I submit the court will be created neutral. These deputies could not have known that the Fourth Amendment prohibited their conduct here. In 2015, the Supreme Court flatly held in Sheehan that failure to accommodate a disability does not violate clearly established Fourth Amendment law. Facts are not the same. Certainly, in this case, they're much less. Much less force was used. I would respectfully submit it's not a sufficient answer to say not to go to a jury so a jury can pass the community collective judgment on what occurred. That defeats one of the purposes of immunity.  I think that the appellees have conceded, although not without some resistance. Their bottom line is that Mr. Saylor shouldn't have been touched. He shouldn't have dealt with in any way by the officers. And I would submit that that's not a proper Fourth Amendment analysis or result. Whether it proves to be the outcome of the case on an ADA trial is a different matter. It has nothing to do with what is at issue here. These officers could not have known they were violating Mr. Saylor's constitutional rights. Are you suggesting that one's mental state, mental disability, is not one of the factors that the officers should assess in determining whether reasonable force should be applied? No, sir. I am not suggesting that at all. I'm saying it is a fact. But it is not, in this context, at least a determinative fact. I think this court has said that in the Bates case. Facts are different. I certainly concede that. As a general proposition, though, all circumstances should be considered. And evident disability is certainly one of them. But consideration of those facts cannot, I would respectfully submit, prohibit or make unlawful any minimal use of force. If so, the concept of reasonableness under the circumstances will have a brand new meaning, one that the deputies could not have anticipated. And I therefore submit that the district court, recognizing the tragedy here, erred in denying the deputies qualified immunity on the 1983 claim, the only matter that's before you. Thank you. We thank you, sir. We will come down and bring counsel, and then we'll move directly into our next case.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Raymond A. Jackson